**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| KARESHA BLACKWELL, on behalf of Plaintiff and the class members described below,<br><br>     Plaintiff,<br><br>vs.<br><br>LOAN SPOT doing business as BLUE MOUNTAIN LOANS; 391 FINANCIAL, INC.; VELOCITY VENTURES GROUP, LLC doing business as INFINITY ENTERPRISE LENDING SYSTEMS; LEAD ENVY, LLC doing business as TEKAMBI; and JOHN DOES 1-20,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT – CLASS ACTION

1. Plaintiff, Karesha Blackwell, brings this action to secure redress from predatory and unlawful loans (such as <u>Exhibit A</u>). The loans are made in the name of Defendant Loan Spot, doing business as Blue Mountain Loans ("Blue Mountain"), via the website www.bluemountainloans.com. Others involved in the making of the loans include 391 Financial, Inc. ("391 Financial"); Velocity Ventures Group, LLC doing business as Infinity Enterprise Lending Systems ("Infinity");  Lead Envy, LLC doing business as Tekambi ("Tekambi"); and John Does 1-20.

2. Plaintiff seeks damages under the Indiana Consumer Credit Code (Count I) and treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §1964 (Counts II-III), and for unjust enrichment (Count IV).

## JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (general federal

-1-

question), 28 U.S.C. § 1332(d) (Class Action Fairness Act), 18 U.S.C. § 1964 (RICO), 28 U.S.C. § 1337 (interstate commerce), and 28 U.S.C. §1367 (supplemental jurisdiction).

4.     On information and belief, there are more than 100 class members and the amount in controversy, on a classwide basis, exceeds $5 million, exclusive of interest and costs.

5.     This Court has personal jurisdiction over Defendants because they:

a.     Knowingly participated in the making and collection of unlawful loans to Indiana residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016), *aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello,* 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures,* 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b.     Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC,* 622 F.3d 754, 760 (7th Cir. 2010).

6.     Venue is proper because acts to obtain and collect the loans impacted Plaintiff in Indiana.

7.     Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury*

*Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

### Plaintiff

8.      Plaintiff Karesha Blackwell is a citizen of Indiana residing in Indianapolis, Indiana.

### Defendants

9.      Defendant Loan Spot, doing business as Blue Mountain Loans ("Blue Mountain"), purports to be an entity chartered pursuant to the laws of the Kashia Band of Pomo Indians of the Stewarts Point Rancheria (the "Tribe"), a federally recognized Indian Tribe.  Blue Mountain can be served at Kashia Band of Pomo Indians Tribal Office, 1420 Guerneville Rd., #1, Santa Rosa, CA 95403.  Blue Mountain issues loans to consumers over the Internet through the website www.bluemountainloans.com.

10.     Defendant 391 Financial is a Missouri corporation with a principal address of 4013 Frontgate Dr., Columbia, MO 65203.  Its registered agent and office is Clay B. Bethune, 5522 Prairie Creek, Columbia, MO 65203.

11.     Defendant Infinity is a limited liability company organized under Florida law which operates at 4864 Sparks Blvd., Sparks, NV 89436.  Its registered agent and office is Corporate Creations Network Inc., 8275 South Eastern Avenue, #200, Las Vegas, NV 89123.

12.     Defendant Tekambi is a Delaware limited liability company with a principal business address of 23150 Fashion Drive, Suite T242, Estero, FL 33928.  Its registered agent and office is Corporate Creations Network Inc., 1521 Concord Pike, Suite 201, Wilmington, DE 19803.

## FACTS RELATING TO PLAINTIFF

13.     On or about January 30, 2024, Blue Mountain Loans made a $600 loan to Plaintiff Karesha Blackwell through bluemountainloans.com at a stated annual percentage rate of 493.45%.  (Exhibit A)

14.     Plaintiff obtained the loan for personal, family, or household purposes and not for business purposes.

15.     Blue Mountain disbursed the loan proceeds via ACH into Plaintiff's bank account in Indiana.

16.     The loan was to be repaid via ACH debits from Plaintiff's bank account in Indiana. Payments were made in that manner.

17.     At no time did Plaintiff set foot on Kashia tribal lands.

18.     Plaintiff obtained the loan via the Internet from Indiana.  (Exhibit B)

19.     Blue Mountain regularly makes loans to individuals in Indiana at such rates. On information and belief, they have made over 100 such loans.

20.     The loans were obtained for personal, family or household purposes and not for business purposes.

21.     Defendants sought out Indiana residents for such loans

## INVOLVEMENT OF OTHER DEFENDANTS IN BLUE MOUNTAIN LOANS
## 391 FINANCIAL

22.     While Blue Mountain is purportedly owned by the Tribe, in reality, the Tribe has virtually nothing to do with the operation of the lending business and simply participates in what is often referred to as a "rent-a-tribe" scheme.

23.     Blue Mountain is beneficially owned and operated by 391 Financial.

24.     391 Financial receives the overwhelming percentage of profits generated.

25.     In a "rent-a-tribe" scheme, non-tribal payday lenders attempt to circumvent state usury laws by invoking the sovereign immunity available to Native American tribes.

26.    While the non-tribal entities operate all substantive aspects of the business such as funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections for the high-interest loans, the tribe acts as a label or figurehead in exchange for what is often a relatively insignificant portion of the revenue generated.

27.    Supposedly, Blue Mountain Financial operates under a lending license granted by the Kashia Tribe under a "lending commission ordinance." (Exhibit C)

28.    The ordinance—"Ordinance #12"—was approved by the Kashia Tribe on August 10, 2013, right before the Kashia Tribe began its first of what would become many "rent-a-tribe" schemes.

29.    The Kashia Tribe is a small, isolated, financially-strapped Native American tribe with approximately 78 members living on its reservation.

30.    Supposedly, the Kashia Tribe operates over a dozen different online lending websites—all of which make small-dollar, short-term loans at triple-digit interest rates—including Evergreen Cash, Redwood Coast Finance, Spring Water Finance, Pave Credit, and others.

31.    Such lending enterprises would make tens of millions of dollars of loans per year and require hundreds of employees to staff.

32.    The Kashia Tribe claims to operate from offices located at 1420 Guerneville Road, Suite 1, Santa Rosa, CA 95403; the office is located in the Coddingtown Plaza Business Park, is roughly 1,000 square feet, and serves as the offices of the tribal government overseeing road work, construction, and other services.

33.    The Kashia Tribe's "lending commission ordinance" does not require a person obtaining a license to be a Tribal member, nor does it require any particular percentage or revenue to be retained by the Tribe.

34.    The "lending commission ordinance," at Part V, "Operational Requirements and

Limitations on Lending Business Activities," paragraph B, sub-paragraph 2, "Consumer Loan Amounts; Fees and other Charges," states "[n]o lender licensee may charge fees, interest or other consideration for the granting of a consumer loan that exceeds $40 per $100 lent." (Exhibit C)

35.    The Loan made to Plaintiff charges more than $40 in fees per $100 loaned.

36.    According to the Tribe's ordinance, Part V, "Operational Requirements and Limitations on Lending Business Activities," paragraph B, sub-paragraph 3, "Loan Terms; Repayment; Extensions," "[t]he initial term of each consumer loan granted by a Lender Licensee shall be at least 3 days but no more than 45 days."

37.    The loan made to Plaintiff is for a term of more than 45 days.

38.    All essential business operations necessary to make the Blue Mountain loans are actually performed in other locations outside of the Tribe's jurisdiction, including Missouri, by and for the benefit of non-tribal investors.

39.    These operations include incoming and outgoing phone calls and emails, review of loan applications, loan underwriting, payment processing, website maintenance, and marketing.

40.    BlueMountainLoans.com, first registered in August 2021, was copied from another website, AmericasCashAdvanceInc.com, registered in 2010 and operated by 391 Financial since that time.

41.    AmericasCashAdvanceInc.com is the website of America's Cash Advance, a lending business owned and operated by 391 Financial, which makes loans to consumers at interest rates as high as 790% annually.

42.    The text and layout of both websites are substantially the same. For example, both websites are titled: "Apply for a cash loan online. We are a direct lender."

43.    The home page of both prominently features the phrase "QUICK LOANS FROM $100 to $1,200, 3 simple steps to get the funds you need." (Exhibits D, E)

44.    Both home pages feature the same "How It Works" section with identical language

other than the phone number, including "[y]ou will receive a call within 15 minutes after completing the steps above. We can be reached at [phone number] for any assistance that may be needed."

45.     The "application information" and "why us" sections are identical, except for the name of the lender.

46.     The "FAQ" (frequently asked questions) pages of both websites contain the identical 18 questions and answers, in the same order, with the same text and language other than the name of the lender.

47.     The IPv4 address of americascashadvanceinc.com is 104.21.35.160, which is a server hosted by Cloudfare, Inc.; the IPv6 address is 2606:4700:3032::6815:23a0.

48.     The IPv4 address of bluemountainloans.com is 104.26.10.85, which is  also a server hosted by Cloudfare, Inc.; the IPv6 address is 2606:4700:20::681a:b55.

49.     The digits 2606:4700 mean the websites are hosted by Cloudfare, Inc. in the same physical data center.

50.     391 Financial raises cash from individual accredited investors, paying them between 11% to 13% annual interest. *See* https://www.391financial.com.

51.     391 Financial informs prospective investors that funds placed with it for investment are used to finance short-term, high interest, small-dollar consumer loans, stating:  "Our interest rates are designed to compensate for the loans that go into default and are never repaid. It is a high risk/high reward business; thus, we have to charge higher interest rates to compensate for the defaults and the small loan amounts. Our investors' interest rate is a fixed amount and is not tied to the performance of individual loans."

52.     In response to an FAQ "Do the usury laws apply?", 391 Financial states: "No. In most states usury laws typically apply to mortgages, but not small consumer loans. States allow high rates on small consumer loans due to the economics of this market. This allows lenders to serve this market profitably."

53.     This statement is untrue.  That it was made shows that 391 Financial knows that its

-7-

loans are illegal.

54.     391 Financial also tells investors "[w]e obtain licensing and follow each state law that we operate in," even though it makes loans via Blue Mountain Loans in Indiana, without a lending license.

55.     391 Financial claims to be part of FFG, LLC, which does business as FinTech Finance Group.

56.     FinTech Finance Group's Vice President is Blake Richter, who was previously the Vice President of Operations for Plain Green, LLC.

57.     Plain Green operated under a rent-a-tribe scheme similar to that of Blue Mountain Loans.  One court described Plain Green as "a payday lending entity cleverly designed to enable [] Defendants to skirt federal and state consumer protection laws under the cloak of tribal immunity. That immunity is a shield, however, not a sword . . .  Tribes and their officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law." *Gingras v. Think Finance, Inc.*, 922 F.3d 112, 128 (2d Cir. 2019).

58.     391 Financial has a related entity called FinTech Call Center, which provides call center services for lending operations such as Blue Mountain Loans.

## INFINITY

59.     Infinity is a "back-end" services vendor that provides software to analyze, underwrite, service, and collect high-interest loans.

60.     Infinity states that its software "can support your vision… and your success. We have built the industry's best solution for Payday loan management. *See* https://www.fintechfinance.io/about-us.  "Our Business Rules Engine will meet your exact lending model and grow along with you. Schedule ACH transactions and reminder messages for automatic payment processes. Follow-up reminders will keep your CSR's on-task when working customer accounts. Refinancing a loan is as easy as clicking a button. Infinity is built to manage your Payday loan product no matter where you are lending."

-8-

61.     Payday Loan Manager is software for operating a payday lending website, including "an integrated ACH provider that automatically handles the crediting and debiting of your loans."

62.     Infinity's website, infinitysoftware.com, as well as paydayloanmanager.com, are hosted on servers owned or managed by Infinity, with an IP address of 169.55.60.156. (Exhibit F)

63.     More than 100 different payday lending websites are hosted by Infinity on the same server, many of which claim sham "tribal" affiliations.

64.     Infinity's website even features testimonials from non-tribal individuals who are, nonetheless, listed as owners or executives of ostensibly "tribal" payday lenders.

65.     One such testimonial is from Dustin A. Dernier ("Dernier"), who is identified as "CEO 605 Lending." (Exhibit G)

66.     Dernier states, "[t]he Infinity Team has helped us grow our start up into something to be very proud of. The entire team has been there for us every step of the way." *Id.* (emphasis added).

67.     Another testimonial is from John Humphrey ("Humphrey"),  identified as "COO DMP Investments." (Exhibit H)

68.     DMP Investments LLC is owned by the Texas payday loan magnate William C. Pruett ("Pruett"), who operates numerous payday lending businesses, including several operated under a "rent-a-tribe" model, including Sky Trail Cash, supposedly owned by the Lac du Flambeau Tribe in rural Wisconsin. It makes loans to consumers in many states at triple-digit rates.

69.     Humphrey states: "Your software platform provided the ideal mix of processing capacity, high availability, and resource scalability that each proved vital components throughout our implementation. We sincerely appreciate the relationship with our friends at Infinity Software and consider their software platform an indispensable resource in operational landscape." *Id.*

70.     Infinity's website features a video touting how its software features "end-to-end loan process automation" and can "automate the loan collection process for maximum results."

71.     Infinity thus provides and manages the software which underwrites and collects Blue

Mountain loans, including the loan to Plaintiff, and also manages the ACH transactions involving Plaintiff's bank account in Indiana. The software was stored and ran on servers belonging to Infinity.

72.   Infinity received a portion of the profits from the Blue Mountain loans.

73.   Infinity provides such services to multiple Internet lenders, including BuffaloLakeLending.com, supposedly owned by the Crow Creek Sioux Tribe in South Dakota, SkyCashUSA.com5, CashAisle.com, and CashAisle.net.

## TEKAMBI

74.   A key component to a successful Internet lending business is the identification of consumers who are willing to take out triple-digit interest rate loans and also have the financial means to repay such loans.

75.   To automate this process, lenders making such loans often utilize firms to purchase leads, analyze those leads, and then underwrite the loan if the lead elects to apply for a loan.

76.   Tekambi advertises itself on its website as "the smartest way to manage lead data" and states that "Tekambi's unique lender solutions optimize the lender / borrower lifecycle." *See* https://tekambi.com/.

77.   Tekambi's services include "loan origination and decisioning, underwriting and fraud prevention, customer management, and collections and debt management." *Id.*

78.   According to a March 1, 2022, press release, Tekambi is "a customer-focused online lead management system for alternative credit lenders. With reliability and flexibility at its core, Tekambi is a robust plug-and-play solution that changes the way lenders manage their marketing campaigns and lead filtering process." Press Release, GlobeNewswire, "Aquila expands across lending vertical with acquisition of Tekambi" (March 1, 2022), https://www.globenewswire.com/en/newsrelease/2022/03/01/2394530/0/en/Aquila-expands-across-lending-vertical-with-acquisition-of-Tekambi.html.

79.   Tekambi actively promotes its software at trade gatherings catering to customers,

and potential customers, who make online loans at triple-digit interest rates, including the "Tribal Lending Summit" held in August 2022 in Lac du Flambeau, Wisconsin. Tekambi was one of the premium sponsors of the Tribal Lending Summit.

80.    By actively promoting its software and services at venues exclusively devoted to online lending at triple-digit rates, Tekambi actively encourages online lenders to use its products for illegal loans.

81.    Tekambi receives payment from Blue Mountain.

**RENT-A-TRIBE SCHEMES**

82.    In an attempt to evade prosecution under usury laws of states like Indiana, non-tribal owners of online payday lending businesses frequently engage in a business model commonly referred to as a "rent-a-tribe" scheme.

83.    Here, and in such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Native American tribes.

84.    The illegal payday loans are then made in the name of a Native American tribal business entity which purports to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation—funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections—are performed by individuals and entities that are unaffiliated with the tribe.

85.    In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme to scheme, the number is almost always in the single digits.

86.    However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

87.    To determine if a particular entity is entitled to sovereign immunity, the majority of

courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

88. These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

89. Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

90. Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

91. Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

92. The excessive interest charges imposed by Defendants were intentional.

## INDIANA REGULATION OF LENDING

93.    The Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-201, establishes a maximum loan finance charge of 36% per annum for consumer loans other than supervised loans.

94.    For loans other than supervised loans, Ind. Code § 24-4.5-3-201 provides:

(1) Except as provided in subsections (7) and (9), with respect to a consumer loan, other than a supervised loan (as defined in section 501 [IC 24-4.5-3-501] of this chapter), a lender may contract for a loan finance charge, calculated according to the actuarial method, not exceeding twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter). . . .

95.    With respect to supervised loans, the Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-508, provides:

Loan finance charge for supervised loans.

(1) With respect to a supervised loan, including a loan pursuant to a revolving loan account, a supervised lender may contract for and receive a loan finance charge not exceeding that permitted by this section.

(2) The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of:

(a) the total of:

(i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter) which is two thousand dollars ($2,000) or less;

(ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and

(iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than four thousand dollars ($4,000); or

(b) twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) of this chapter). . . .

96.    There is also a provision for small loans, Ind. Code § 24-4.5-7-101 *et seq.*, but it does not authorize Defendants' rates, and requires that small loans conform to other requirements that Defendants' loans do not comply with.

97.    Ind. Code. § 24-4.5-7-201, "Limitations on finance charges," provides:

(1) Finance charges on the first two hundred fifty dollars ($250) of a small loan are limited to fifteen percent (15%) of the principal.

(2) Finance charges on the amount of a small loan greater than two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400) are limited to thirteen percent (13%) of the amount over two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400).

(3) Finance charges on the amount of the small loan greater than four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550) are limited to ten percent (10%) of the amount over four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550).

(4) The amount of five hundred fifty dollars ($550) in subsection (3) is subject to change under the provisions on adjustment of dollar amounts (IC 24-4.5-1-106). However, notwithstanding IC 24-4.5-1-106(1), the Reference Base Index to be used under this subsection is the Index for October 2006.

98.    The amount of finance charge provided for in Exhibit A is more than double that permitted in Indiana under any provision.

99.    Ind. Code § 24-4.5-1-201, "Territorial application," provides:

(1) Except as otherwise provided in this section, this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals, made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the following apply: . . .

(c) A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt is received by the lender or a person acting on behalf of the lender in this state.

(d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.

(e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction secured by an interest in land located outside Indiana.

(f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a creditor's place of business in another state.

For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise transmitted or communicated, to a person who has actual or apparent authority to act for the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .

(5) Notwithstanding other provisions of this section:

> (a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence applies; and

> (b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

> (a) An agreement that the law of another state shall apply.

> (b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.

> (c) An agreement that fixes venue. . . .

(8) If a creditor or a person acting on behalf of the creditor has violated the provisions of this article that apply to the authority to make consumer loans (IC 24-4.5-3-502), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24-4.5-5-202.

100.    Ind. Code § 24-4.5-5-202, "Effect of violations on rights of parties," provides:

. . .  (3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and ***if the debtor has paid an excess charge the debtor has a right to a refund***. A refund may be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights who undertakes direct collection of payments from or enforcement of rights against debtors arising from the debt.

***(4) If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered***

*even though the creditor has refunded the excess charge.* No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made. . . .

(7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.

(8) In any case in which it is found that a creditor has violated this Article, the court may award *reasonable attorney's fees* incurred by the debtor. . . . (Emphasis added)

101.    The excessive interest charges imposed by Defendants were willful.

## COUNT I – INDIANA UNIFORM CONSUMER CREDIT CODE

102.    Plaintiff incorporates paragraphs 1-101.

103.    This claim is against all Defendants.

104.    Because the loan made to Plaintiff violated the rate limits set by Indiana law, and the violation was intentional, Plaintiff and other borrowers are entitled to ten (10) times the amount of the excess charge.

## CLASS ALLEGATIONS

105.    Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

106.    The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made by "Blue Mountain Loans" at more than 36% interest (all of its loans qualify) (c) on or after a date two years prior to the filing of this action.

107.    Plaintiff may alter the class definition to conform to developments in the case and discovery.

108.    The class is so numerous that joinder of all members is not practicable. On

information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

109.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

110.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

111.    Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

112.    A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.    Individual actions are not economically feasible.

      b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

      i.    Statutory damages;

      ii.    Attorney's fees, expenses and costs; and

      iii.    Such other or further relief as is appropriate.

## **COUNT II – RICO**

113.    Plaintiff incorporates paragraphs 1-101.

114.    This claim is against  391 Financial, Infinity, Tekambi and John Does 1-20, who are the RICO "persons."

115.    All loans made by "Blue Mountain Loans" to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the usurious rate is at least twice the enforceable rate (36%).

116.    The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

117.    Blue Mountain Loans is an enterprise affecting interstate commerce, in that it is located outside of Indiana and makes loans to Indiana residents via the Internet.

118.    Defendants against  391 Financial, Infinity, Tekambi and John Does 1-20 are associated with this enterprise.

119.    Defendants 391 Financial, Infinity, Tekambi and John Does 1-20 conducted or participated in the conduct of the affairs of Blue Mountain Loans through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §1962(c).

120.    Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

121.    Plaintiff brings this claim on behalf of a class.

122.    The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made by Blue Mountain Loans at more than 36% interest (all of its loans qualify) (c) which loan was made on or after a date 4 years prior to the filing of suit.

123.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

124.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

a.    Whether the loans at issue are "unlawful debts" as defined in RICO.

b.    Whether Blue Mountain Loans  is an "enterprise."

c.    Whether Defendants 391 Financial, Infinity, Tekambi and John Does 1-20 are associated with the enterprise.

d.    Whether Defendants 391 Financial, Infinity, Tekambi and John Does 1-20 conducted or participated in the affairs of Blue Mountain Loans through a pattern of making and collecting unlawful loans.

125.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

126.    Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

127.    A class action is superior for the fair and efficient adjudication of this matter, in that:

a.    Individual actions are not economically feasible.

b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants 391 Financial, Infinity, Tekambi and John Does 1-20 for:

i.    Treble damages;

ii.    Attorney's fees, litigation expenses and costs of suit; and

iii.    Such other or further relief as the Court deems proper.

## COUNT III – RICO

128.    Plaintiff incorporates paragraphs 1-101.

129.    This claim is against Defendants 391 Financial, Infinity, Tekambi, and John Does 1-20, who are the RICO "persons."

130.    All loans made by Blue Mountain Loans to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the loan was made on or after a date four years prior to the filing of this action, and (d) the usurious rate is at least twice the enforceable rate (36%).

131.    The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

132.    Blue Mountain Loans is an enterprise affecting interstate commerce, in that

it is located outside of Indiana and makes loans to Indiana residents via the Internet.

133. Defendants 391 Financial, Infinity, Tekambi, and John Does 1-20 conspired and agreed to operate Blue Mountain Loans through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §1962(d).

134. Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

135. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

136. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made by Blue Mountain Loans at more than 72% interest (c) which loan was made on or after a date four years prior to the filing of this action.

137. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

138. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

        a.    Whether the loans at issue are "unlawful debts" as defined in RICO.

        b.    Whether Blue Mountain Loans is an "enterprise."

        c.    Whether the Defendants named herein agreed and conspired to make unlawful loans through by Blue Mountain Loans.

139. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

140. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

141. A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.      Individual actions are not economically feasible.

      b.      Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

      i.      Treble damages;

      ii.      Attorney's fees, litigation expenses and costs of suit; and

      iii.      Such other or further relief as the Court deems proper.

## COUNT IV – UNJUST ENRICHMENT

142.      Plaintiff incorporates paragraphs 1-101.

143.      This claim is against all Defendants.

144.      Defendants engaged in inequitable conduct by making loans in excess of the rate limits set by Indiana law, such that it would be unfair and result in unjust enrichment if Defendants were not forced to disgorge the interest they obtained.

## CLASS ALLEGATIONS

145.      Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

146.      The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made by "Blue Mountain Loans" at more than 36% interest (all of its loans qualify) (c) on or after a date two years prior to the filing of this action.

147.      Plaintiff may alter the class definition to conform to developments in the case and discovery.

148.      The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

149.      There are questions of law and fact common to the class members, which common

questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans, and whether Defendants are thereby unjustly enriched.

150.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

151.    Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

152.    A class action is superior for the fair and efficient adjudication of this matter, in that:

    a.    Individual actions are not economically feasible.

    b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

    i.    Appropriate monetary relief;

    ii.    Costs; and

    iii.    Such other or further relief as is appropriate.


*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Heather A. Kolbus
Caileen M. Crecco
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603-1841
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com
Dedelman@edcombs.com
hkolbus@edcombs.com
ccrecco@edcombs.com

## JURY DEMAND

Plaintiff demands trial by jury.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

## <u>NOTICE OF ASSIGNMENT</u>

Please be advised that all rights relating to attorney's fees have been assigned to counsel.


*/s/ Daniel A. Edelman*
Daniel A. Edelman

## DOCUMENT PRESERVATION DEMAND

Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, loan, sale or file associated with Plaintiff, and any account or loan or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

T:\41829\Pleading\Complaint_Pleading.wpd